## S. B. THOMPSON v. G. L. REIBER.

ERROR TO THE COURT OF COMMON PLEAS NO. 2 OF ALLE-
GHENY COUNTY.

Argued November 5, 1888—Decided January 7, 1889.

*(a)* Under the rules of the oil exchange, a purchase of oil on one day was to be closed by a delivery of certificates through the exchange clearing house before the close of business on the next day.

*(b)* Plaintiff, a broker in the exchange, purchased for the defendant, a customer, 50,000 barrels at 83, and notified the defendant thereof, who the next morning ordered the oil purchased on his account to be sold at once for cash.

*(c)* The plaintiff made the sale, with the oil of other customers, at 75, and settled for the balance on his sheet in the clearing house by passing his check for the difference against him, which check was paid.

*(d)* The defendant, in this as in many other transactions about the same time, furnished no money or security to the plaintiff, whose only profits in the orders were the commissions paid him by the defendant upon the amount of the purchase or sale.

1. In the action by the broker to recover from the defendant the loss on the purchase and sale referred to, the plaintiff testifying that the purchase of the oil for the defendant was bona fide, and that it would have been delivered the next day but for the positive instruction to sell for cash, the credibility of the testimony, and the question whether the purchase and sale was a wagering transaction with the intent to settle only for the difference resulting, were matters to be submitted to the jury.

Before GORDON, C. J., PAXSON, GREEN, CLARK, WIL-
LIAMS and HAND, JJ.; STERRETT, J., absent.

No. 199 October Term 1888, Sup. Ct.; court below, No. 495 April Term 1887, C. P. No. 2.

To the first Monday of April, 1887, a summons was issued in an action by S. B. Thompson against G. L. Reiber. The narr declared for the recovery of a balance of $4,250 due to the plaintiff in the matter of a purchase and sale of oil for the defendant, on May 16, 1884. Issue.

At the trial on November 28, 1887, the following facts appeared, chiefly from the testimony of the plaintiff himself:

On May 15, 1884, the plaintiff, a member of the Pittsburgh Petroleum, Stock and Metal Exchange, and doing business subject to its rules, received the written order of the defendant reading as follows: "S. B. Thompson, 5, 15, '84: Please buy 50 M. at best. Lou," upon which he bought for the defendant, 50,000 barrels of oil, at $83\frac{1}{4}$ cents per barrel. The purchase was made in open market in two lots, one of which was minuted in the broker's book as follows: "Pittsburgh, May 15, 1854, of J. C. Fisher & Co., 45,000 barrels United at $83\frac{1}{4}$; storage paid and deliverable. J. C. Fisher, seller." There was a similiar contract made for 5000 barrels, signed by C. C. Beggs & Co., sellers. Under the rules of the exchange, the oil could not be delivered until the following day, when it must be delivered through the exchange clearing house by the sellers in certificates, accepted, taken out and paid for by the broker before the close of business. The plaintiff notified the defendant of the purchase immediately after it was made, and of the money required to pay for the oil. The next morning, May 16th, the defendant sent this order: "S. B. Thompson: Sell spot oil flat at best; we cannot take care of it. Lou. 5, 16, '84." This order reached the plaintiff about 11:30 A. M., after the oil had been delivered to him in the clearing house, but before it had been taken out by him; thereupon he went upon the floor and offered 61,000 barrels of oil, including that he had for the defendant, and it was taken by J. C. Fisher & Co. at 75 cents for cash. These purchasers being the persons from whom the plaintiff had bought the oil the day before, the plaintiff was credited on his sheet in the clearing house with the amount realized from the sale, and gave his check to the clearing house for the balance against him, which check he testified was paid.

The plaintiff testified, in substance, that there was no understanding or agreement that the oil was not to be delivered:

that no "margins" were ever put up by the defendant; that the oil would have been taken out of the clearing house for him, but for his order to sell; and that, simply buying the oil as the defendant's agent, the plaintiff had no profit in the transaction outside his commission. On cross-examination, the plaintiff testified, inter alia:

Q. You stated that you bought this oil in your own name? A. Yes, sir.

Q. It would amount at the price you have given to $41,625? A. In that neighborhood, yes, sir.

Q. Had you the money to pay for that at the time you bought it?

Objected to as irrelevant. Objection overruled.

A. I had to furnish the money to pay for it.

Q. Cannot you answer that question; I ask you whether you had the money at the time? A. I did not.

Q. Did you disclose to Fisher & Co. and Beggs & Co. who you were buying it for? A. No, sir.

Q. You answered me that you had had other dealings with Mr. Reiber before this? A. I had.

Q. How long before this transaction did you commence to have such dealings? A. I don't remember how far back it went.

Q. About how long before May, 1884? A. Say two or three months.

Q. How frequent had the transactions been; had they been daily or weekly? A. I cannot remember now without reference to my book.

Q. Did they cover considerable purchases or not? A. Quite an amount of oil, yes, sir.

Q. And what was the course of dealing with reference to taking and disposing of the oil, between you and Mr. Reiber, up to the time of the transaction in question in this suit? A. The title of the oil remained in Mr. Reiber and I followed his instructions.

Q. Is it not a fact that the whole course of dealing between you was to speculate in oil with a view to not taking the oil but risking a gain or settling the losses, as the case might be? A. I followed his instructions.

Q. And there was no understanding to that effect? Was

not that the practice, that you bought the oil, carried it on margins or partial deposits and then sold as the market advanced, or to make as little loss as possible, and was not this so through all your transactions with Mr. Reiber? A. I followed his instructions in all purchases and sales for him.

Q. How much oil did you buy for him at any one time before this transaction? A. I think about 300,000 barrels, or may be 350,000 barrels.

Q. No, but at one time? A. Not over 100,000 barrels.

Q. There was one occasion then of 100,000 barrels? A. I think so; yes, sir.

Q. Take that transaction, you bought that at what price? A. I do not remember.

Q. About how much? A. I don't want to swear to any price.

Q. As nearly as you can tell? A. It was at least 75 cents.

Q. Did he put up the entire price? A. No, sir.

Q. What he did then was to make a contract through you for the oil and then sell it in order to determine what the gain or loss might be? A. Similar transactions to this one.

Q. Was not the purpose, as understood by you and Mr. Reiber, to deal in oil, simply with reference to the gain or loss upon it, without reference to the actual delivery of the oil? A. That was not the understanding; no, sir.

Q. Is not that the way you did it? A. The transactions were made on his instructions, and I was not in collusion with him in any manner.

Q. Take this 100,000 barrel purchase; you say that he did not put up the price for that. A. No, sir.

Q. What became of it? A. It was sold for his account.

Q. He ordered you to buy that much without putting up the price, and then ordered you to sell it? A. Yes, sir.

Q. Was it the same way all through? A. That was the way all through.

Q. Then it was left to you, was it, to devise ways and means to carry the oil until he should determine to sell? A. I followed his instructions in regard to the handling of the oil all the way through.

Q. He was not at the time in the oil business? A. No, sir; he was in pretty good standing, in my opinion.

Arguments.

By the court: What business was he in? A. Cashier of the Penn Bank.

The witness then produced his ledger account with the defendant showing the business done for the latter from April 5, 1884, to May 16th. The cash items to the credit of the defendant thereon, in all the transactions, aggregated $800, representing the amount paid by the defendant as commissions to the plaintiff. The cash items charged to the defendant, for the same time aggregated $10,211.25, representing the profits of the defendant in the transactions, paid over to him by the plaintiff.

The court, WHITE, J., charged the jury that under all the evidence in the case, their verdict should be for the defendant.

The jury having returned a verdict for the defendant, judgment was entered, when the plaintiff took this writ, assigning the instruction to find for the defendant, as error.

*Mr. S. B. Schoyer* (with him *Mr. S. Schoyer, Jr.*), for the plaintiff in error:

1. In all transactions between a customer and his broker, on the exchange, the wager, if any, must of necessity be either between the customer and the broker, as principals between themselves, or between the customer and third parties, through the broker as agent. Now, "a wager is a contract in which the parties stipulate that they shall gain or lose upon the happening of an uncertain event in which they have no interest, except that arising from the possibility of such gain or loss:" Fareira v. Gabell, 89 Pa. 89, 90. Three things are necessary to constitute a wager: (*a*) There must be two parties; (*b*) one of them must win and the other lose; (*c*) neither must have the intention to deliver or receive: Smith v. Bouvier, 70 Pa. 325; Boundtree v. Smith, 108 U. S. 269, 276.

2. Therefore, there is no wager between the customer and broker, as principals, if it be not shown: (*a*) That the broker was to derive and did derive a profit from the transaction, aside from his fixed commissions; (*b*) the parties being considered as occupying the position of principals as between themselves, that the broker had no intention of delivering, nor the customer of receiving. The only position left for the parties, then, is

that of principal and agent; the customer dealing with third parties through the medium of the broker. In this case, precisely the same principles apply, except that the wager must be established as between the broker as agent and the third parties with whom he deals as such agent. To establish this, it must be shown: (*a*) That the parties with whom the broker dealt as such agent never made any delivery to him, nor intended to do so; (*b*) that neither the broker, nor the third parties with whom he dealt, had any intention of delivering or receiving.

3. An examination of the authorities in this state will show that the foregoing propositions are correct. All transactions which have been held illegal, have been so held because they were assumed to be wagers, and conformed to the definition of a wager as above set forth: Brua's App., 55 Pa. 294; Fareira v. Gabell, 89 Pa. 89, 90; Ruchizky v. De Haven, 97 Pa. 202; Dickson v. Thomas, 97 Pa. 278; Smith v. Bouvier, 70 Pa. 325. Now, as the plaintiff had no interest in the transaction in question, aside from his fixed commissions, and no margins had been put up, it follows that the wager, if any, could not have been between plaintiff and defendant as principals, as they occupied the position of principal and agent, and it must be shown to have been between plaintiff and the parties with whom he dealt as agent for the defendant. But members of the firm of Fisher & Co. and Beggs & Co. testified that both firms made the sale on the 15th, that they intended to deliver, and they actually did deliver through the clearing house, and that they were paid for their oil. As to the clearing house, its operations were of the same nature as those of the clearing house as described by Mr. Justice PAXSON, in German N. Bank v. Farmers D. N. Bank, 118 Pa. 311, except that instead of clearing money, the oil exchange clearing house clears deliveries of oil.

*Mr. John S. Ferguson,* for the defendant in error:

1. The facts developed on the trial demonstrated the truth of our allegation that the transaction was a gambling one. The defendant furnished no money to make the purchase. The plaintiff furnished none. There was no delivery by the so-called sellers. The consummation of the transaction was a settlement for the differences established by the market.

2. In less than six weeks, plaintiff had bought for defendant about 350,000 barrels of oil, representing not less than $275,000. In all these transactions, the defendant did not put up a dollar of money or security. Each one of them was settled on the basis of the market differences. They were plainly oil gambling transactions, on the understanding that no oil was to be delivered or received. On his own showing, the plaintiff simply played the game for defendant's account. "When a party enters into stock-gambling transactions through the medium of a broker, he will be deemed to be dealing with such broker as principal, not as an agent: Ruchizky v. De Haven, 97 Pa. 202. The cases in this state from Brua's App., 55 Pa. 294, down to Dickson v. Thomas, 97 Pa. 278, are fatal to plaintiff's claim.

OPINION, MR. JUSTICE PAXSON:

We think it was error to withdraw this case from the jury. It may be that the purchase of oil was a gambling transaction, and that the jury might have found it so. But the case depended upon the oral testimony, and that was for the jury. The learned judge instructed them that "under all the evidence in the case your verdict must be for the defendant." This withdrew from the jury the question of the credibility of the witnesses. It is true the principal testimony tending to show that this was a gambling transaction, came from the plaintiff himself. At the same time if, as the plaintiff testified, this was a bona fide purchase of oil, and the only reason why a full delivery was not made was that such delivery was prevented by the positive instruction of the defendant the next morning to sell the oil for cash, and the sale in pursuance of such instructions was to the same party from whom the plaintiff had bought it, there was a question left for the jury. Had the instruction of the court been that if the jury believed from the evidence that there was no delivery and no intended delivery of the oil, but that it was a mere sale upon a margin with the intent to settle for differences, the case would have been free from difficulty. As it stands we think the question of its being a wagering transaction should have been left to the jury.

Judgment reversed, and a venire facias de novo awarded.